1

2          *POSTED ON WEBSITE*
           *NOT FOR PUBLICATION*
3

4

5          **UNITED STATES BANKRUPTCY COURT**

6          **EASTERN DISTRICT OF CALIFORNIA**

7

8
   In re                                        )    Case No.  23-90111
9                                               )    Docket Control No.  DB-2
   MICHAEL ERICH HOFMANN,                       )
10                                              )
                    Debtor.                     )
11  _____    )

12
    **This Memorandum Decision is not appropriate for publication.**
13  **It may be cited for persuasive value on the matters addressed.**

14
                    **JOINT MEMORANDUM OPINION AND DECISION FOR;**
15
           **1.  MOTION FOR ORDER DISTRIBUTING FUNDS FROM SALE OF**
16         **RESIDENCE, FILED IN BANKRUPTCY CASE 23-90111, DCN: DB-2**
                                        **AND**
17             **2. MOTION FOR SUMMARY JUDGMENT FILED IN**
                **ADVERSARY PROCEEDING 23-9006, DCN: BSH-1**
18

19          Through the Subchapter V Bankruptcy Case filed by Debtor Michael Hofmann (the

20  "Debtor"), 23-90111, and related Adversary Proceedings, 23-09006, which is the removed

21  California Superior Court Action, for Stanislaus County, *Michael Hofmann v. Sharon Hofmann* et

22  al, Case No. 2200623, (the "State Court Partition Action"), this court has been given the

23  responsibility to enforce the Second Amended Partition Judgment (Exhibit 2; Dckt. 485)  entered

24  in the State Court Partition Action.   Debtor and Gary Hofmann and Sharon Hofmann (the

25  "Petitioners"),[1]  as provided in the Confirmed Subchapter V Plan (Fourth Amended Plan of

26  _____

27          [1] The court collectively refers to Sharon Hofmann and Gary Hofmann as the
    "Petitioners," to be consistent with the shorthand identification term used in the Second
28  Amended Partition Judgment and Rulings.

Reorganization for Small Business under Chapter 11, referred to as the "Subchapter V Plan") and Confirmation Order[2]; have presented the court with counter motions for the distribution of the Partition Sales Proceeds from the court ordered sale (the "Partition Sale") of the real property commonly known as 13330 Valley Home Road, Valley Home, California (the "Residence Property") in this Bankruptcy Case. The proceeds from the Partition Sale total $406,241.01 (the "Partition Sales Proceeds") and are being held by the Subchapter V Trustee pending this court's ruling on the two Motions.

The Second Amended Partition Judgment determined that the Debtor had an 8.333% interest in the Residence Property and the Petitioners each had a 45.833% (for a combined 91.666% ) interest in the Residence Property.

Normally, the distribution of the net sales proceeds from a partition sale would be a simple mathematical calculation based on the respective ownership interests. However, as has been demonstrated by the years of State Court litigation and the litigation in this Bankruptcy Case, the Debtor and Petitioners have not been able to reach an economic agreement as to their interests as defined in the Second Amended State Court Judgment.

**State Court Partition Action and Pre-Petition**
**Second Amended Partition Judgment**

The Petitioners have presented the court with the Second Amended Partition Judgment determining their respective interests, specifically tasking the court with determining the application of surcharges and credits to be made with respect to their interests. There is a further award of attorney's fees and costs in the Second Amended Partition Judgment in favor of Petitioners against the Debtor that this court must consider. The Statement of Decision was entered on July 19, 2019, and the original State Court partition judgment was entered thereon. Exhibit B; Dckt. 485. The final Appellate Decision, which is seventy-five (75) pages in length, affirming the Second Amended

---

[2] Dckts. 385, 470. In this Decision, when the court references a Docket or Dckt. number, the court is identifying the docket number in the Bankruptcy Case, 23-90111. If the court is referencing a docket number in Adversary Proceeding 23-09006, the court will identify it as "Adv. Pro. Dckt." and then state the number.

1   Partition Judgment as to Petitioners, but reducing the credit to the other parties to the State Court

2   Partition Action not involving the Residence Property was entered on July 15, 2021.  Exhibit 1;

3   Dckt. 485.  The Second Amended Partition Judgment, to correct the amount of credit for the other

4   parties, was then entered on January 25, 2022.

5          Following the entry of the Second Amended Partition Judgment, the Debtor, who resided in

6   and controlled the Residence Property, was "unable" to sell the Residence Property and have the

7   Partition Sales Proceeds disbursed as ordered by the State Court.  Then, on the eve of the State Court

8   taking action to enforce the Second Amended Partition Judgment, Debtor filed this Bankruptcy

9   Case.

10  The Second Amended Partition Judgment

11         In the Second Amended Partition Judgment, the State Court Judge determines that the

12  Residence Property cannot be partitioned in kind, but must be sold and the proceeds thereof be

13  "partitioned" between the owners.

14         The Second Amended Partition Judgment first determines the percentage ownership interests

15  of the Debtor and Petitioners in the Residence Property itself, stating:

16
            a.      Debtor owns an 8 1/3% interest in the Residence Property.
17
            b.      Creditors Sharon Hofmann and Gary Hofmann each own a 45 5/6%
18                  interest in the Residence Property.

19  Second Amended Partition Judgment, p. 3:3-7; Exhibit 2, Dckt. 485.

20         The Second Amended Partition Judgment then continues, determining specific credits and

21  surcharges that the Debtor and Petitioners have as part of the Second Amended Partition Judgment

22  in determining the partition of the proceeds from the sale of the Residence Property, stating:

23          c.      "The Parties [which include Debtor and Petitioners] are entitled to a
                    credit in the amount of that party's  percentage ownership interest in
24                  the parcels, as set forth above."  *Id*.; p. 5:9-10.

25  Thus, the first credits that Debtor and Petitioners have for division of the proceeds from the sale of

26  the Residence Property are for their percentage ownership in the Residence Property.

27         The Second Amended Partition Judgment then continues to determine additional credits for

28  and surcharges against the Debtor and Petitioners in determining the partition of the proceeds from

the sale of the Residence Property, stating:

      d.     Credits and Surcharges for Debtor:

            i.     "[Debtor] is surcharged for his occupancy of the Residence for the period of September 1, 2015, through March 31, 2019, in the amount of $84,300, plus prejudgment interest of $6,276.81, for a total of $90,576.81. Interest at the annual rate often percent (10%) shall run from the date of entry of this Interlocutory Judgment."

            ii.    "[Debtor] shall receive a total credit of $142,122 if he leaves the grain tanks on the Residence Property, and in the alternative, he shall receive a total credit of $62,269 if he removes the grain tanks. *Id.* at 5:14-17.

      e.     "[Creditor Sharon Hofmann], as Trustee of the Lois Hofmann Trust, shall receive a total credit of $12,059.88. *Id.* at 5:18-19.

The Second Amended Partition Judgment goes further beyond the partition of the sales proceeds and allowances of credits and the surcharge, and awards Petitioners attorney's fees and costs of $122,395.71 and $10,485.00, respectively. *Id.* at 6:4:4-7, 4:9-14. These attorney's fees and costs are not designated as a credit or surcharge.

The Second Amended Partition Judgment then totals the surcharge, attorney's fees, and costs to compute the total monetary judgment of what Debtor owes Petitioners, totaling $223,457.62. *Id.*; p. 6:18-19. When the Second Amended Partition Judgment was entered on January 21, 2022, the Residence Property had not yet been sold, and the application of the credits and surcharges could not be computed to determine whether what, if any, monetary obligation remains after distributing proceeds from the sale of the Residence Property. The applicable paragraph discussing the total award states as follows:

      f.     The total monetary judgment for Creditors Sharon Hofmann and Gary Hofmann against Debtor in Possession is $223,457.62. This calculation is $132,880.81 in fees and costs plus $90,576.81 in rent surcharge.

In their Motion, Petitioners assert that Debtor is not entitled to any credit for the grain tanks (also referred to as the "Rice Bins") because they were removed from the Residence Property and not sold as a part thereof. The Second Amended Partition Judgment provides for the credit as follows:

viii. The Parties are also entitled to credits or allowances as follows:

    1.    Michael shall receive a total credit of $142,122 if he leaves the grain tanks on the Real Property, and in the alternative, he shall receive a total credit of $62,269 if he removes the grain tanks.

*Id.*; p. 5:13-17.

By the plain language of the Second Amended Partition Judgment, Debtor will be allowed a credit of $142,122, so long as "he," the Debtor, does not remove them. In this Bankruptcy Case the Debtor did not remove the grain tanks from the Residence Property. Rather, it was the Subchapter V Trustee, who was granted possession and sole control over the Residence Property as part of the Bankruptcy Estate, who removed the grain tanks. While the Petitioners could spend tens of thousands of further dollars arguing whether the Subchapter V Trustee, whose duties run to the Bankruptcy Estate, is a "successor" who comes under the Second Amended Partition Judgment paragraph above, as shown in the computation of the distribution amounts to the Petitioners, after application of credits and surcharge, such is of insignificant economic consequence (especially in light of the hundreds of thousands of dollars in legal fees and years of time spent in litigation to date).

Again, reading the plain language of the Second Amended Partition Judgment, it is the Debtor whose credit would be reduced if he, **the Debtor**, removes the grain tanks. No reference is made to a successor in interest or a Subchapter V Trustee under operation of Federal Law taking control of property of a bankruptcy estate and making decisions concerning the property without regard to the desires of the Debtor in Possession.

**Relief Sought by Petitioners**

In their Motion, Petitioners assert the right to 100% of the Partition Sale Proceeds. Dckt. 480. They argue that their credits and the surcharges against the Debtor exhaust any value in the Partition Sale Proceeds that the Debtor may claim. The court expressly addresses the surcharges and credits, and applications thereof, in detail below.

**Relief Sought by Debtor**

Debtor's request for Disbursement of the Partition Sale Proceeds (which was filed as a motion for summary judgment in the Adversary Proceeding; 23-9006; Dckt. 52) is based on an

5

1  analysis that the credits are first disbursed, and that any surcharge amount has been reduced to a

2  monetary judgment, which obligation is asserted to have been discharged. Debtor lays out the

3  grounds for this in the Points and Authorities he has filed. Adv. Proc. No. 23-9006; Dckt. 56. He

4  asserts that there cannot be a setoff or recoupment for the surcharge amount since it was made part

5  of the Second Amended Partition Judgment.

### CALIFORNIA PARTITION LAW, CREDITS AND SURCHARGES

8  What this court has been presented with is the State Court Second Amended Partition

9  Judgment, and is now asked to enforce that Judgment. The State Court determined that the real

10  property could not be partitioned in kind, with each of the owners taking their percentage interest

11  in "dirt," but that the Residence Property had to be sold and the Partition Sale Proceeds then be

12  partitioned between the owners.

13  Attached to and incorporated in the Second Amended Partition Judgment are two Rulings

14  issued by the State Court. Exhibits A and B attached to the Second Amended Partition Judgment,

15  Exhibit 2; Dckt. 485. In the State Court's July 19, 2019 Ruling, the State Court cites to California

16  Probate Code §§ 16007, 16420, 16440, 16441 with respect to the surcharge being imposed.

17  Exhibit B, pp. 13:3-10, 15:7-13.

18  California Probate Code § 16420 provides that if a trustee of a trust commits a breach of

19  trust, a beneficiary or co-trustee may commence a proceeding to obtain specified relief, which

20  includes "To compel the trustee to redress a breach of trust by payment of money or otherwise."

21  Cal. Probate § 16420(a)(3).

22  In the various pleadings filed by the Petitioners, none addresses the issue of what is a

23  "surcharge" and how it applies in a partition action where the property is sold and the proceeds are

24  to be distributed to the owners. The Second Amended Partition Judgment and the two Rulings

25  attached thereto expressly state that Debtor is surcharged the amount for his occupancy of the

26  Residence Property.

27  With respect to the award of attorney's fees and costs, it separately states that Petitioners will

28  "recover" from Debtor $132,880.81 in attorney's fees and costs, not that Debtor is surcharged that

1  amount.

2  Interestingly, the court could not find within the Probate Code a statutory definition or

3  procedure for a "surcharge" with respect to the misconduct of a trustee. Black's Law Dictionary

4  provides the following definition:

5
6  surcharge vb. (15c)

7  1. To impose an additional (usu. excessive) tax, charge, or cost.

8  2. To impose an additional load or burden.

9  3. (Of a court) to impose a fine on a fiduciary for breach of duty.

10  4. To overstock (an area) with animals.

11  - second surcharge (18c) To overstock (a common) a second time for which a writ
   of second surcharge was issued.

12  - surcharge and falsify (18c) To scrutinize particular items in an account to show
13  items that were not credited as required (to surcharge) and to prove that certain items
   were wrongly inserted (to falsify). • The courts of chancery usu. granted plaintiffs
   the opportunity to surcharge and falsify accounts that the defendant alleged to be
14  settled.

15  Black's Law Dictionary (12th ed. 2024).

16  Here, the State Court expressly "taxed" or "charged" Debtor in Possession for his use and

17  control of the Residence Property as part of the Second Amended Partition Judgment. This

18  surcharge accounts for the value of the trust asset obtained by Debtor in advance of the partition and

19  sale from his use of it through the exclusion of the other co-tenants. This surcharge then is applied

20  to adjust Debtor's interest in the trust asset, the Residence Property, that was liquidated through the

21  State Court Partition Action and the Debtor's Bankruptcy Case.

22  **Application of Surcharges and Credits**
23  **for Division of Partition Sales Proceeds**

24  Petitioners assert the right to all of the Partition Sale Proceeds from the sale, stating that there

25  are mutual debts to be offset. What they assert is that the surcharges against Debtor's interests are

26  personal obligations owed to each of them. However, that does not obviate the need to follow the

27  Second Amended Partition Judgment and apply the credits (which includes the portion of the

28  proceeds based on the ownership interest in the Residence Property itself) and surcharges to

1    compute the distribution of the Partition Sale Proceeds.  As noted above, the State Court expressly

2    identified credits and surcharges, and then separately, not using the words surcharge or credit,

3    awarded attorney's fees and costs.

4          Here, the court begins with determining the value of Debtor's and Petitioners' interests in

5    the Partition Sale Proceeds from the sale of the Residence Property, which Debtor controlled as the

6    trustee of the Eric Hofmann Trust.  As Petitioners assert, Debtor failed and refused to execute deeds

7    or to distribute the trust assets to them.

8          Petitioners assert that pursuant to 11 U.S.C. § 553 they can exercise the right of offset on the

9    mutual debts between the Debtor and Petitioners.  They argue that since there are surcharges and

10   credits that must be applied, there are mutual obligations owed between the Petitioners.

11   Additionally, they assert that these include the attorney's fees and costs awarded them against the

12   Debtor.

13         Petitioners cite to 11 U.S.C. § 553 in asserting the right that any interests of Debtor in the

14   Partition Sales Proceeds from the sale of the Residence Property may be offset against any

15   obligations owed by the Debtor to Petitioners.  11 U.S.C. § 553 provides:

16        § 553. Setoff

17        (a) Except as otherwise provided in this section and in sections 362 and 363 of this
          title, this title does not affect any right of a creditor to offset a mutual debt owing by
18        such creditor to the debtor that arose before the commencement of the case under this
          title against a claim of such creditor against the debtor that arose before the
19        commencement of the case, except to the extent that—
          [the exceptions do not apply to the obligations that are the subject of the setoff]
20        . . . .

21   As noted in 5 Collier on Bankruptcy ¶ 553.04, 11 U.S.C. § 553 does not create a right of setoff, but

22   preserves a right of setoff that may exist under state law.

23         Petitioners cite to several Ninth Circuit Decisions that provide a good analysis of both the

24   right of setoff and the right of recoupment.  The court provides the following extensive quotations

25   from and analysis of two of the Decision.

26         The first is *Newbery Corp v. Fireman's Fund Insx. Co*, 95 F.3d 1392 (9th Cir. 2000), which

27   includes the following:

28        "The right of setoff (also called 'offset') **allows entities that owe each other money**

8

**to apply their mutual debts against each other**, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 133 L. Ed. 2d 258, 116 S. Ct. 286, 289 (1995) (citation omitted). The **defining characteristic of setoff is that "the mutual debt and claim . . . are generally those arising from different transactions."** 4 Collier on Bankruptcy Par. 553.03, at 553-14 (15th ed. 1995) ("Collier").

Setoff in bankruptcy cases is governed by 11 U.S.C. § 553.[8] It **has been used by creditors "as a defense in an action by the trustee for the recovery of money from the creditor**." Collier Par. 553.01[4], at 553-7. **Section 553 "is not an independent source of law governing setoff; it is generally understood as a legislative attempt to preserve the common-law right of setoff arising out of non-bankruptcy law.**" *United States v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756, 763 (9th Cir. 1994) (quoting United States v. Norton, 717 F.2d 767, 772 (3d Cir. 1983)).   Under section 553(a), each debt or claim sought to be offset must have arisen prior to filing of the bankruptcy petition. In addition, "a claim may . . . be set off without regard to whether it is contingent or unliquidated, as long as the claim qualifies as 'mutual' under applicable nonbankruptcy law . . . ." Collier Par. 553.01[4], at 553-6 (citation omitted). [9]  **In order for countervailing debts to be "mutual," they must be "in the same right and between the same parties, standing in the same capacity.**" Collier Par. 553.04[2], at 553-22 (citing *England v. Industrial Comm. of Utah (In re Visiting Home Services, Inc.)*, 643 F.2d 1356, 1360 (9th Cir. 1981)). The **mutuality requirement stems from section 553(a)'s reference to "a mutual debt" owed by a creditor to the debtor against the creditor's claim against the debtor,**[10] and **it is strictly construed.** Collier Par. 553.04[1], at 553-20. The rationale for strict construction of the requirement has been explained as follows:

> The mutuality requirement in bankruptcy should be strictly construed because **setoffs run contrary to fundamental bankruptcy policies such as the equal treatment of creditors and the preservation of a reorganizing debtor's assets**: As Congress recognized, setoffs work against both the goal of orderly reorganization and the fairness principle because they preserve serendipitous advantages accruing to creditors who happen to hold mutual obligations, thus disfavoring other equally-deserving creditors and interrupting the debtor's cash flow.

*Federal National Mortgage Assoc. v. County of Orange (In re County of Orange)*, 183 Bankr. 609, 615 (Bankr. C.D. Cal. 1995) (internal quotation marks and citation omitted).

The **right of setoff is permissive, not mandatory; its application "rests in the discretion of [the] court,** which exercises such discretion under the general principles of [equity]." *In re Cascade Roads*, 34 F.3d at 763 (internal quotation marks and citation omitted); Collier Par. 553.02, at 533-13 (citation omitted). "The **burden of proving an enforceable right of setoff rests with the party asserting the right.**" *In re County of Orange*, 183 Bankr. at 615. Finally, the right of setoff is subject to the automatic stay provisions of Chapter 11. See 11 U.S.C. § 362(a)(7) (staying "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor").

In contrast to setoff, **recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action**, strictly for the **purpose of abatement or reduction of such claim**." Collier Par.

553.03, at 553-15 (emphasis in original). Under recoupment, a **defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction**.'" *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir. 1986) (citations omitted). For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses. *See, e.g., In re California Canners and Growers*, 62 Bankr. 18, 22 (9th Cir. BAP 1986) (Elliott, Bankruptcy J., concurring) (citation omitted).

Recoupment, like setoff, has been applied in bankruptcy proceedings. *See, e.g., In re B & L Oil Co.*, 782 F.2d at 157. However, there are distinctions between the two that are particularly important in bankruptcy. *Id.* Collier explains that **the primary difference is that the limits placed on setoff under section 553 generally do not apply to recoupment claims**. Collier states, for example, that "the chief importance of the recoupment doctrine in bankruptcy is that, unlike setoff, recoupment is often thought not to be subject to the automatic stay." Collier Par. 553.03, at 553-15 - 553-16 n.5 (citations omitted). In addition, **"invocation of recoupment also relaxes the requirement of mutuality for setoff of debts as it relates to the pre or postpetition character of those debts**." *Id.* Collier offers the following rationale for this general rule:

> In any suit or action between the estate and another, the defendant should be entitled to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's claim. There is no element of preference here or of an independent claim to be set off, but merely an arrival at a just and proper liability on the main issue, and this would seem permissible without any reference to . . . section 553(a).

Collier Par. 553.03, at 553-17 (citing *Quittner*, 202 F.2d at 816 n.3). The Tenth Circuit has offered a similar rationale for treating setoff and recoupment differently in bankruptcy cases:

> In bankruptcy, both recoupment and setoff are sometimes invoked as exceptions to the rule that all unsecured creditors of a bankrupt stand on equal footing for satisfaction. Recoupment or setoff sometimes allows particular creditors preference over others. Setoff is allowed in only very narrow circumstances in bankruptcy. But a creditor properly invoking the recoupment doctrine can receive preferred treatment even though setoff would not be permitted. **A stated justification for this is that when the creditor's claim arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation**, and application of the limitations on setoff in bankruptcy would be inequitable.

*In re B & L Oil Co.*, 782 F.2d at 157 (internal quotation marks and citations omitted) (cited in Collier Par. 553.03, at 553-15 - 553-16 n.5); *see also Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir. 1984); *In re Harmon*, 188 Bankr. 421, 425 (9th Cir. BAP 1995) ("The invocation of the recoupment doctrine promotes no preference problem. It is applied when there are countervailing claims arising from the same transaction 'strictly for the purpose of abatement or reduction . . . .'") (internal quotation marks and citation omitted); *Photo Mechanical Services, Inc. v. E.I. DuPont de Nemours & Co., Inc. (In re Photo Mechanical Services, Inc.)*, 179 Bankr. 604, 612 (Bankr. D. Minn. 1995).

---------------------------------------------------------

FN. 8.  " Except as otherwise provided . . . this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case . . . . " 11 U.S.C. § 553(a).

FN. 9.  Because the contracts in this case were executed in Arizona, the "applicable nonbankruptcy law" in this case is Arizona law. Arizona's definition of recoupment and setoff appears to parallel Collier's:

> Although related concepts, set offs and counterclaims are distinguishable from recoupment. A set off or counterclaim is a demand which the defendant has against the plaintiff arising out of a transaction extrinsic to the plaintiff's cause of action, whereas a recoupment is a reduction by the defendant of part of the plaintiff's claim because of a right in the defendant arising out of the same transaction.

*Morris v. Achen Constr. Co., Inc.*, 155 Ariz. 507, 747 P.2d 1206, 1209 (Ariz. App. 1986) (citation omitted), rev'd in part on other grounds, 155 Ariz. 512, 747 P.2d 1211 (1987).

FN. 10.  A "claim" includes a "right to payment," and a "debt" is a "liability on a claim." 11 U.S.C. § 101. "In the setoff context . . . 'claim' and 'debt' are . . . correlative terms." Collier Par. 553.04[1], at 553-19 n.1 (citation omitted).

---------------------------------------------------------

*Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d at 1398-1400 (emphasis added).

In reviewing the above, for both setoff and recoupment, there must be mutual debts owed between the parties.  For setoff, these are generally obligations arising from different transactions, in which the debts are "netted out," with there remaining only a balance owing from the larger debt of debtor 1 after the smaller debt owed by debtor 2 reduces the larger debt of debtor 1.

As stated in *Newbery* above, recoupment is slightly different:
In contrast to setoff, recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's [**13] claim or cause of action, strictly for the purpose of abatement or reduction of such claim." Collier Par. 553.03, at 553-15 (emphasis in original). Under recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.'" Ashland Petroleum Co. v. Appel (In re B & L Oil Co.), 782 F.2d 155, 157 (10th Cir. 1986) (citations omitted).

*Id*. at 1399.

The concept of recoupment was more recently addressed by the Ninth Circuit Court of Appeals in *Gardens Reg'l Hosp. & Med. Ctr. Liquidating Trust v. California (In re Gardens Reg'l Hosp. & Med. Ctr., Inc.)*, 975 F.3d 926 (9th Cir. 2020).  In addressing the application of recoupment,

11

1  as compared to setoff, the Ninth Circuit states:

2      By contrast, the conceptual foundation of **equitable recoupment is not the**
3  **adjustment of separate mutual debts but the process of defining the amount**
    **owed under a single claim**. *See Reiter*, 507 U.S. at 265 n.2 ("Recoupment permits
4  a determination of the 'just and proper liability on the main issue[.]'") (citation
omitted); *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d
5  1005, 1008-09 (9th Cir. 1988) ("**If recoupment applies, the creditor's claim arises**
**from the same transaction as the debtor's claim, and it is essentially a defense**
6  **to the debtor's claim against the creditor rather than a mutual obligation.**"
(simplified)). Because "recoupment is in the nature of a right to reduce the amount
7  of a claim, and does not involve establishing the existence of independent
obligations," 5 Collier on Bankruptcy ¶ 553.10 (Richard Levin & Henry J. Sommer,
8  eds., 16th ed. 2019) (emphasis added), the caselaw has recognized that recoupment
is not subject to all of the same strictures in bankruptcy as setoff. For example,
9  because "**the limits placed on setoff under section 553 generally do not apply to**
**recoupment claims**," *Newbery*, 95 F.3d at 1399, "[u]nlike setoff, recoupment is not
10  limited to pre-petition claims and thus may be employed to recover across the
petition date," Sims, 224 F.3d at 1011. And as noted earlier, "'unlike setoff,
recoupment is often thought not to be subject to the automatic stay.'" *Newbery*, 95
11  F.3d at 1399 (citation omitted).

12      We have emphasized that the "limitation of recoupment that balances [these]
advantage[s]" under bankruptcy law "is that the **claims or rights giving rise to**
13  **recoupment must arise from the same transaction or occurrence that gave rise**
**to the liability sought to be enforced by the bankruptcy estate.**" *Sims*, 224 F.3d
14  at 1011. Accordingly, we have defined recoupment in the bankruptcy context as
"'**the setting up of a demand arising from the same transaction as the**
15  **plaintiff's claim or cause of action, strictly for the purpose of**
**abatement or reduction of such claim**.'" *Newbery*, 95 F.3d at 1399 (second
16  emphasis added) (citation omitted). In addressing whether the countervailing claims
or rights asserted by the creditor arise from the same transaction or occurrence—and
17  therefore qualify as a permissible recoupment for federal bankruptcy purposes—we
"have held that the crucial factor . . . is **the 'logical relationship' between the two.**"
18  *Sims*, 224 F.3d at 1012 (quoting *Newbery*, 95 F.3d at 1403).

19      In *Newbery*, we derived this "logical relationship" test from the Supreme
Court's analysis of pleading standards governing compulsory counterclaims in the
20  era prior to the Federal Rules of Civil Procedure. 95 F.3d at 1402 (citing *Moore v.*
*N.Y. Cotton Exch.*, 270 U.S. 593, 610, 46 S. Ct. 367, 70 L. Ed. 750 (1926)). That
21  makes sense, given the common-law-pleading origins of the doctrine, *Lee*, 739 F.2d
at 875, and indeed, **recoupment has been described as "the ancestor of the**
22  **compulsory counterclaim and setoff of the permissive counterclaim,**" *Coplay*
*Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1440 (7th Cir. 1993) (citations
23  omitted); see generally 6 Charles Alan Wright, Arthur R. Miller, & Mary K. Kane,
Federal Practice & Procedure § 1401 (3d ed. 2010). In both *Newbery and Sims*, we
24  noted that the Supreme Court in *Moore* had held that whether claims or rights arise
from the same transaction "'depend[s] not so much upon the immediateness of their
25  connection as **upon their logical relationship**.'" *Sims*, 224 F.3d at 1012 (quoting
Moore, 270 U.S. at 610); *see also Newbery*, 95 F.3d at 1402 (same). In *Sims*, we
26  therefore expressly rejected "the Third Circuit's narrow definition of 'transaction,'"
which in our view improperly gave dispositive weight to the temporal immediacy of
27  the countervailing claims rather than to their logical relationship. 224 F.3d at 1014
(citing *University Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1081
28  (3d Cir. 1992)).

While **we have thus noted the "flexible meaning" of the same-transaction requirement,** *see Newbery*, 95 F.3d at 1402, we have also **cautioned that "the 'logical relationship' concept is not to be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction**," *Sims*, 224 F.3d at 1012. The test remains whether the relevant rights being asserted against the debtor are sufficiently logically **connected to the debtor's countervailing obligations such that they may be fairly said to constitute part of the same transaction**. *Sims*, 224 F.3d at 1012; Newbery, 95 F.3d at 1401-02. Moreover, while we have rejected the Third Circuit's narrow focus on temporal proximity, we have stated our express agreement with that court's separate "observation that **courts should apply the recoupment doctrine in bankruptcy cases only when 'it would . . . be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations.**'" *Newbery,* 95 F.3d at 1403 (alteration in original) (quoting University Med. Ctr., 973 F.2d at 1081); *see also Sims*, 224 F.3d at 1014. Furthermore, as Collier explains, **"care should be taken" in applying the doctrine of recoupment in the bankruptcy context, given that "improper application of the doctrine, coupled with its ostensibly exempt status under sections 553(a) and 362, could undermine the fundamental purposes of these statutory provisions.**" 5 Collier on Bankruptcy, supra, ¶ 553.10[3]. "[A]pplication of the doctrine in any particular case" is therefore "sometimes scrutinized from the perspective of its effect on the fundamental policies of these provisions." *Id.*; *see also Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 134 (2d Cir. 1998) **(recoupment should not be broadened "in contravention of the federal bankruptcy policies of debtor protection and equal distribution to creditors").**

*Gardens Reg'l Hosp. & Med. Ctr. Liquidating Trust v. California (In re Gardens Reg'l Hosp. & Med. Ctr., Inc.)*, 975 F.3d at 933-935 (emphasis added).

Whether it be setoff or recoupment, there must be obligations owed by each of the parties to the other. In reading the Second Amended Partition Judgment, the State Court Judge determined that there are obligations and credits arising out of Debtor's and Petitioners' actions concerning the Residence Property that affect the distribution of the Partition Sale Proceeds to the owners (Debtor and Petitioners) of the Residence Property.

Here, the plain language used by the wise State Court Judge imposed the surcharge on the Debtor and granted credits to the Debtor and Sharon Hofmann in determining the respective interests of the parties in the Partition Sales Proceeds, which functionally serves as the recoupment for that transaction. The State Court Judge did not order that any attorney's fees and expense obligations of the Debtor were to be surcharged against his interest in the Residential Property.

**Discussion of Partition**
**Law in California**

A body of law neither of the Parties appear to present to the court, but the court has found

13

to be instructive and helpful, is the partition law for the State of California. Indeed, partition was discussed through the appellate court's opinion found at Exhibit 1, Dckt. 485. *See* Ex. 1, ps 44-45. Miller and Starr discuss partition in the treatise of California Real Estate 4th Edition. The Treatise states:

> **Recovery in partition action**. The cotenant who paid the costs for improvement of the property receives an increase in his or her equity in the property by the amount advanced. On a sale of the property pursuant to an order for sale in an action for partition, whether or not the other cotenant has consented to the improvements, the cotenant who advanced the costs for improvements is entitled to be reimbursed for the entire amount advanced or the amount by which the improvements have enhanced the value of the property before the balance of the sales proceeds are divided among the cotenants.

MILLER AND STARR, 4 CAL. REAL EST. § 11:8 (4th ed.).

> **The decree can resolve claims between the cotenants**. All conflicting claims existing between the parties and arising out of their relationship as cotenants can be adjudicated in the partition action. Thus, for example, the court can determine whether a deed under which a party claims is an absolute conveyance or merely a mortgage. It also can determine whether a judgment obtained by one cotenant against the other is a lien on the latter's interest in the common property.

> **Accounting; reimbursement of costs, expenses, and improvements by one cotenant**.   An action for partition may include an accounting so that the respective rights of the parties can be adjusted and settled. A cotenant who has advanced funds to pay common expenses is entitled to reimbursement from the sale proceeds before the balance is divided and distributed to the cotenants. A cotenant out of possession can require the cotenant in possession to account for rents and profits or other compensatory adjustment in the division of the sale proceeds.

> Even though a cotenant who is not in possession cannot collect the rental value from the tenant in possession, on partition, the court can offset the rental value against the claim by the cotenant in possession for amounts advanced for interest, taxes, and insurance premiums before distribution of the sale proceeds. The court can also credit the cotenant in possession for the amounts advanced for loan payments and improvements for the cotenancy property.

> A cotenant who has received an advance on part of his or her estate must account for the property received and may receive only the proportion of the remainder to which he or she is equitably entitled. A cotenant who has paid more than his or her portion of the purchase price for the property is entitled to an accounting and an adjustment of the excess.

> A cotenant who has paid an obligation for the benefit of the common property, discharged a lien or assessment, expended money in redeeming the property from sale, or incurred necessary expenses in caring for the property, is entitled to recover a proportionate share from a cotenant who has received the benefit of the payment. The partition decree can provide that the share of the latter be charged with a lien for the sums advanced.

> Finally, the court has the authority to make compensatory adjustments between the

14

parties according to the ordinary principles of equity in all cases where equal partition of the property cannot be made.

**Costs of partition**. The costs reimbursed before any distribution to the parties include the fees of any attorney engaged for the common benefit of the parties, the fees and expenses of the referee and third persons hired by the referee, the cost of title reports, and interest on these expenditures. . .

**The balance of the proceeds is distributed among the parties, subject to any offsets or credits that may be due one cotenant against the other, and the court can impose a lien on the property or proceeds of any cotenant as security for payment of his or her share of the costs**.

MILLER AND STARR, 4 CAL. REAL EST. § 11:18 (4th ed.) (emphasis added).

**Reimbursement for improvements**. A cotenant who has in good faith made improvements to the property necessary for its preservation is entitled to reimbursement in the partition action even though the improvements were made without the knowledge or consent of the other cotenants. That is, the other cotenants who share in the benefits of the improvements are chargeable with their proportionate share of the cost even though they were made without their express or implied consent. . .

Whether the partition is by a division of the property or the distribution of the sales proceeds, the cotenant who has made the improvement is entitled to the resulting enhancement in value.

MILLER AND STARR, 4 CAL. REAL EST. § 11:19 (4th ed.).

California Courts of Appeals have handled the issue of partition by sale, applying charges and credits in the distribution of proceeds, stating:

An action for partition is governed by the broad principles of equity jurisprudence, and the courts have adhered, in adjusting the rights of co-tenants and defining their interests in the common property, **to the classic formulas encapsulated in the maxims that equity is equality and he who seeks equity must do equity**, and have dispensed equitable relief only upon condition that the equitable rights of a co-tenant are respected and safeguarded. . .

**Every partition action includes a final accounting according to the principles of equity for both charges and credits upon each co-tenant's interest**. Credits include expenditures in excess of the co-tenant's fractional share for necessary repairs, improvements that enhance the value of the property, taxes, payments of principal and interest on mortgages, and other liens, insurance for the common benefit, and protection and preservation of title.

*Wallace v. Daley*, 270 Cal. Rptr. 85, 89 (Cal. Ct. App. 1990) (internal quotations omitted) (emphasis added).

Importantly, Miller and Starr provides further insight into how the cotenants out of possession may recover rent and profits from the cotenant in possession. The Treatise states:

**Recovery of rental value on an ouster**. A cotenant who is not in possession may only recover the rents and profits, or the value of possession, from the cotenant in possession when there has been an ouster excluding the cotenant from possession,[8] or when the other cotenant's occupancy was pursuant to an agreement to share the rents and profits from their property. Absent an agreement or an ouster, a cotenant out of possession has no right to recover the rental value of the property from a cotenant in possession.

**Lien for share of rents and profits**. The non-occupying tenant may have an equitable lien on the interest of the cotenant in possession for a share of the rents and profits, but this lien is not enforceable against a bona fide purchaser of the interest of the tenant in possession.

**Right of cotenant not in possession to offset against claims by the cotenant in possession**. When one cotenant has exclusive possession of the cotenancy property, the rental value of the premises may be offset by the cotenant out of possession against the claims of the cotenant in possession for contribution for interest, taxes, insurance, and loan obligations paid.

MILLER AND STARR, 4 CAL. REAL EST. § 11:4 (4th ed.). This Section of Miller and Starr is especially helpful in this case because the trial court and appellate court found that Debtor engaged in actions consistent with ouster, permitting Petitioners to recover, or offset, rents and profits against the property improvement contributions made by Debtor. *See* Opinion, Exhibit 1 at 38, Dckt. 485. Debtor did not sufficiently rebut the ouster argument, according to the appellate court. *Id.*

Cal. Code Civ. P. § 873.820 gives some directive as to how a court distributes the proceeds in partition, stating:

The proceeds of sale for any property sold shall be applied in the following order:

(a) Payment of the expenses of sale.

(b) Payment of the other costs of partition in whole or in part or to secure any cost of partition later allowed.

(c) Payment of any liens on the property in their order of priority except liens which under the terms of sale are to remain on the property.

(d) Distribution of the residue among the parties in proportion to their shares as determined by the court.

As discussed in the Miller and Starr Treatise and by the California Courts of Appeal, partition gives parties in interest a right to offset charges and credits. The Second Amended Partition Judgment in this case involved a partition by sale, allocating credits and offsetting those credits against surcharges. *See* Opinion, Ex. 1 at ps 43-45 (discussing partition by sale in the context

16

1  of this case).

2       The court computes the surcharges and credits below.

3
4  **Computation of the Interests of the**
**Petitioners in the Partition Sales Proceeds**

5       In correctly computing the respective distribution amounts from the Partition Sale Proceeds

6  from the sale of the Residence Property, the court applies the credits and surcharges to the respective

7  interests of the Petitioners.  For ease of computation, the court has combined the interests of

8  Petitioners, given that each are asserting their respective 45.8333% interests against the Debtor's

9  interest.  A possible "tweaking" of Petitioners' amount is that in the Second Amended Partition

10  Judgment Sharon Hofmann is awarded a credit of $12,059.90.  Second Amended Partition Judgment,

11  p. 5:18-19; Exhibit 2, Dckt. 485.  However, in their Motion for distribution of the Partition Sale

12  Proceeds, they assert that both Petitioners have the $12,059.88 credit.  Motion, p. 8:10-11;

13  Dckt. 480.  The court therefore treats the credit of $12,059.90 as belonging equally to both

14  Petitioners.

15  **Request for Post-Judgment Credits**

16  Post-Judgment Property Tax Credit

17       As part of the Motion, Petitioners request a credit for the post-judgment property taxes for

18  the years 2020 through 2025.  This credit was not awarded in the Second Amended Partition

19  Judgment because the property taxes were paid post-judgment while Debtor continued to reside in

20  the Residence.  It is clear that the court is to award this credit because "[a] cotenant who has

21  advanced funds to pay common expenses is entitled to reimbursement from the sale proceeds before

22  the balance is divided and distributed to the cotenants." MILLER AND STARR, 4 CAL. REAL EST.

23  § 11:18 (4th ed.).

24       Exhibit 10 is a copy of the property tax payments for the years 2023-2024.  Dckt. 485.

25  Petitioner Gary Hofmann provides his Declaration, in which he testifies to having payments totaling

26  $13,238.40 for the 2019-2020 through the 2024-2025 tax years.  Dckt. 484.  He states that these are

27  the property taxes for the Residence Property.  *Id.*, ¶ 2.

28       He also testifies that John Brichetto paid the property taxes between 2019 and 2024, and that

17

Gary Hofmann reimbursed Mr. Brichetto. *Id*.; ¶ 3. Petitioner Gary Hofmann directs the court to review Exhibit 9, copies of the tax bills, and Exhibit 10, copies of the checks and credit card receipts for payment of the property taxes.

The Second Amended Partition Judgment was entered on July 19, 2019. The check provided as documentation of the payment of the 2019 property tax year was issued on July 23, 2023. Exhibit 10; Dckt. 458 at 179. This payment was not made until well after the Second Amended Partition Judgment was entered, and was not an expense for which Petitioners could have requested a credit in July 2019.

The court allows as an additional credit the sum of $13,238.40 for Petitioners for payment of the Residence Property Taxes for the 2019-2020 through 2024-2025 tax years.

Post-Judgment Underground
Tank Remediation

Gary Hofmann testifies that he paid "$11,145.96 to remove and remediate the underground storage tank on the Residence so that it could be sold." Decl. ¶ 4, Dckt. 484. Petitioner Gary Hofmann directs the court to Exhibits 11 and 12 as evidence of the work that was done and amounts paid. *Id*.; ¶ 4.

The record shows that the underground storage tanks were an impediment to the sales process. On March 13, 2024, the court granted the initial Motion to Sell the Residence to Debtor. Order, Dckt. 265. However, that sale fell through because Debtor never obtained funding. The back up buyers, the Cleghorns, also backed out. The Subchapter V Trustee ultimately brought another Motion to Sell on October 16, 2024. Dckt. 372. In those pleadings it became clear that the Cleghorns backed out of the sale as the back up buyers due to the risk of the underground tanks and their immediate need to be removed. *See* Decl. ¶ 13, Dckt. 365.

Therefore, the court finds that the expense of $11,145.96 for the remediation was a necessary expense that was paid by Petitioners, and led to the Residence Property being sold by the Subchapter V Trustee.

The court awards a credit in the amount of $11,145.96 to Petitioners for improving the

1  Residence Property and removing the underground tanks.[3]

2  **Request for Additional Surcharge**
   **by Petitioners Sharon Hofmann**
3  **and Gary Hofmann**

4          In their Motion for the Distribution of the Partition Sales Proceeds, Petitioners request that

5  this court allow them additional credits as part of the distribution computation. The additional

6  amounts they seek to "recover" are $59,000.00 for rent (which would actually be in the nature of

7  a surcharge under the Second Amended Partition Judgment) post-judgment, and $27,684.36 for

8  insurance, taxes, and improvements paid post-judgment. The property taxes and grain tank removal

9  credits were awarded and discussed above. The remaining requests are discussed in turn.

10 Post-Judgment Rent Value

11         First, Petitioners assert that the Debtor owes at least $59,000.00 for rent during the period

12 from May 2019 through April 2024. The court first notes that Debtor commenced his Bankruptcy

13 Case on March 20, 2023. Thus, as of March 2023, the Residence Property was property of the

14 Bankruptcy Estate, which was then under the control of the Debtor, serving in his fiduciary capacity

15 as the Debtor in Possession.

16         The Second Amended Partition Judgment addresses the rights of co-owners of real property

17 to occupy it without owing "rent," and situations where one tenant in common who occupies the

18 property to the exclusion of other tenants in common may be liable for "rent." The exceptions to

19 the rule that one tenant in common may occupy the property without paying rent to the other co-

20 tenants in common is stated in the Judgment as:

21         However, there are several exceptions to this rule. A cotenant out of possession may
           recover rent when there has been an ouster excluding that cotenant from possession.
22         (*Estate of Hughes* (1992) 5 Cal.App.4th 1607.)  Also, a trustee in exclusive
           possession of property who wrongfully withholds from his or her cotenants their
23

24  _____

25         [3]  In awarding these credits, the court notes that 91.666% of it is being paid by Petitioners
    back to themselves. If the court did not award the credit, then, for example, the $11,145.96
26  relating to the underground tank remediation would have remained in the Partition Sale Proceeds
    pot, to be divided 8.33% to Debtor and 91.666% to Petitioners. Debtor's share of this credit
27  works out to be $928.79. One wonders whether the cost and expense of requesting such credit
    exceeds the actual benefit to Petitioners in seeking this credit. For the credit of $13,238.40 the
28  payment of the property taxes, the cost to the Debtor is $1,103.15.

1    equitable interests is liable to the latter for rent. (*See Teixeira v. Verissimo* (1966)
2    239 Cal.App.2d 147.)  Moreover, in a partition action, a cotenant out of possession
     may recover rent when recovery of the imputed rental value would be "just and
3    consonant with equitable principles." (*Hunter v. Schultz* (1966) 240 Cal.App.2d 24,
     32.)

4    Statement of Decision, p. 13:15-22; Exhibit B to Second Amended Partition Judgment Exhibit 2;

5    Dckt. 485.

6          With the Residence Property becoming property of the Bankruptcy Estate March 20, 2023,

7    the court concludes that the exceptions to the normal cotenant rule are not applicable.  Once it

8    becomes property of the Bankruptcy Estate, the fiduciary thereof had to take control of and protect

9    such property.  True, the Debtor was residing there, but he was also providing "on the ground

10   protection."  On June 15, 2023, "just" three months after this case was filed, the Subchapter V

11   Trustee filed a Motion to Remove the Debtor in Possession from control of both the Residence

12   Property and the Farm Property.  At that point, the Debtor clearly was not controlling the Residence

13   Property.[4] This facilitated the goal of Petitioners to get the property sold and have it done by a third-

14   party.

15         For the period of May 2019 through February 2023, the court concludes that while it may

16   have been unsettling to Petitioners that Debtor, as the Trustee of the Eric Hofmann Trust, was

17   continuing to reside in and occupy the Residence Property, the court does not award a further

18   surcharge for this time spent occupying the Residence.  Though the Debtor continued to use the

19   State Court to litigate his dispute and delay the ultimate sale of the Residence Property and the Farm

20   Property, it was as part of that post-Second Amended Partition Judgment Litigation.

21         As a financially practical matter, given the huge legal expenses incurred though the State

22   Court Litigation and Petitioners recovering 90.24% of the Sales Proceeds after application of the

23   credits and surcharges in the Second Amended Partition Judgment as computed by the court, any

24   further surcharge is of little economic significance compared to further litigation.

25         Of great significance, the court also considers the condition of the Residence Property, which

26   _____

27        [4] This removal of control and transfer to the Subchapter V Trustee was agreed to by the
     Petitioners and other parties in interest to allow for the effective marketing and commercially
28   reasonable sale of the Residence Property and the Farm Property.

1    Petitioners describe in their Motion as (emphasis added):

2    Michael allowed the Residence to significantly deteriorate, a fact confirmed by an
3    appraisal obtained in October 2022. (Exhibit 4.) The report noted the Residence
     suffers from:

4         **extensive deferred maintenance**. The bathroom **floor has dry rot
          and evidence of mold**. The **roof** of the house **needs to be replaced**.
5         The **interior needs paint and flooring**, the **exterior has extensive
          dry rot on the wood siding, deck and roof eaves.** The exterior
6         needs repairs & paint. The kitchen and bathrooms need updating of
          full remodels.  The shop and barn are in average condition, there is
7         mold present in the barn ceiling. NOTE: The appraiser is not a
          licensed contractor and recommends a full pest & home inspection to
8         determine the extent of the repairs needed and the **presence of any
          mold contamination**.

9
     (*Id*. at 144.) Photographs taken by the appraiser confirm these facts (examples
10   below):

11   [Photographs Omitted]

12        The condition was such **that Sharon could no longer obtain insurance for
          the Residence**, which was last insured in 2021. (Sharon Hofmann Decl. at 2, ¶ 4;
13   Exhibit 13.)

14   Motion, p. 4:10-5:2; Dckt. 480.  Though the Appraisal Report was filed as Exhibit 4, Dckt. 485, the

15   text of the Report is illegible.

16        There has been no sufficient showing by Petitioners that the Debtor was maintaining

17   possession of the Residence Property to the exclusion of Petitioners which resulted from any loss

18   of use value for either of them.   Rather, they show that the Debtor was choosing to live in a health-

19   risky residence among the mold and dry rot in the Residence, and that there was no rental value for

20   such Residence Property.[5]

21        Taking the statement made above in the Motion, which is subject to the certifications made

22   pursuant to Federal Rule of Bankruptcy Procedure 9011, it is asserted by Petitioners that the

23   Residence Property was uninhabitable by any tenant.  There was no lost rental value.  While as a co-

24   owner the Debtor chose to live in mold and dry rot, that does not create a rental value.

25   _____

26        [5]  Given that it is commonly known of the health risk of mold in homes and that rental of
     such homes is not proper and can subject the lessor to significant liability, the court has not
27   provided citations to such authorities.  If Sharon Hofmann or Gary Hofmann believe that their
     assertion of mold and dry rot in the Residence Property is improper or that the rental of such
28   property is legally proper and financially sound, their counsel may address that with the court.

1    Attorney's Fees and Costs

2       Petitioners have also asserted that $122,395.81 award of attorney's fees and costs be

3 surcharged against the Debtor's interest in the Residence Property. As the court addresses above,

4 the Second Amended Partition Judgment does not provide for the attorney's fees and expenses to

5 be a credit for or a surcharge against any interests in the Residence Property or Sales Proceeds

6 thereof. The State Court was very careful in identifying credits and surcharges to be addressed with

7 the Partition Sale Proceeds. Attorney's fees and costs were not an obligation of the Debtor that

8 constituted a credit for Petitioners or a surcharge against Debtor in favor of Petitioners.

9       The court does not award this amount as a credit or surcharge in computing the disbursement

10 of the Partition Sale Proceeds.

11    Property Insurance

12       Plaintiffs also request reimbursement for property improvements and insurance costs.

13 Sharon Hofmann testifies that she paid $3,300.00 in insurance for the Residence. Decl. ¶ 2, Dckt.

14 483. The years requested are from 2018 through 2021. Exhibits have been submitted that show the

15 declaration pages for the policies; however, there are no Exhibits showing receipt of payment or

16 otherwise who paid for the policies. Exhibit 13, Dckt. 485.

17       The court also considers that two of the years requested, 2018 through 2019 and 2019

18 through 2020, implicate the dates before or just leading up to the Second Amended Partition

19 Judgment, and so the court does not include those amounts as a credit in this ruling.

20       Therefore, the court finds the only eligible year insurance may be reimbursed, 2020 through

21 2021, has not been adequately shown to the court that Sharon Hofmann paid the expense.

22 **Debtor's Assertion That the Surcharge**
**was Discharged or Made a General Unsecured Claim**
23 **by the filing of Proof of Claim 12-1 by Petitioners**

24       Debtor made the argument at the initial hearing on this Motion and in his Motion for

25 Summary Judgment that the surcharge was assumed into the total award of the Judgment, and

26 therefore the surcharge is discharged along with attorneys' fees and costs awarded in the Judgment.

27 *See* Adv. Proc. No. 23-09006, Mot. for Summ. J., Dckt. 52. The applicable provision of the

28 Judgment that is in controversy reads:

1    The total monetary judgment for Petitioners against Michael Hofmann is
     $223,457.62 (which includes an award of attorneys' fees, costs, and the rent
2    surcharge with then-applicable interest).

3    Second Amended Partition Judgment, Exhibit 2 at 6:18-21 Dckt. 485.

4          The court disagrees that the surcharge, as mentioned in the final paragraph as a total award,

5    is discharged along with the remainder of the Judgment.  To accept this interpretation of the Second

6    Amended Partition Judgment would be not only inconsistent with the Second Amended Partition

7    Judgment itself, but also California partition law and partition of sales proceeds when the real

8    property cannot be partitioned in kind.

9          The Second Amended Partition Judgment specifically identifies and provides for credits and

10   surcharges to be made in computing the disbursement of the Partition Sale Proceeds.  This includes

11   the surcharge against Debtor and in favor of Petitioners for Debtor's occupancy of the residence to

12   the exclusion of Petitioners.

13         Debtor would have the court completely ignore that section of the Second Amended Partition

14   Judgment and instead find that operative language is the final paragraph of the Judgment.  The court

15   is not inclined to ignore the allocation of charges and credits as required for the equitable

16   distribution of proceeds from the partition sale.

17         While Debtor argues that "obviously" the court deleted the surcharge from computing the

18   partition of the Partition Sale Proceeds, the court sees there being a much more proper, legally

19   consistent, reason for the State Court Judge specifically identifying surcharges and credits, rather

20   than just "lumping them out" in some net monetary judgment amount.

21         At the time the Second Amended Partition Judgment was entered, the Residence Property

22   had not been sold.  The State Court Judge had no way to provide for the credits (which includes the

23   percentage ownership interest in the Residence Property being partitioned through court ordered

24   sale) and surcharges at the time the Second Amended Partition Judgment was entered.  The court

25   had no way to know if there were going to be surcharge amounts that did not get addressed through

26   the partition of the Partition Sale Proceeds, and thus the amount of any potential monetary judgment.

27         The State Court Judge expressly identified the surcharge and credit amounts, included the

28   surcharge amounts as part of the monetary judgment, and then when the Residence Property was

1  sold, application of the surcharge to Debtor's interest in the Partition Sale Proceeds could occur and

2  thereby reduce the amount of the Second Amended Partition Judgment for such surcharge amounts.

3         The application of credits and surcharges to compute the partition of the Partition Sale

4  Proceeds is consistent with California Law and correctly computes the respective amounts of the

5  Partition Sale Proceeds to be distributed to the three owners of the Residence Property.

6  <u>Confirmation of Chapter 11 Plan and Filing of Proof of Claim 12-1</u>
   <u>Does Not Render the Surcharge a Discharge Debt For Computing</u>
7  <u>the Partition of the Partition Sale Proceeds</u>

8         Debtor has argued that because there is a confirmed Subchapter V Plan in this Case and that

9  Subchapter V Plan was premised on Petitioners having filed Proof of Claim 12-1 for a $334,038.37

10 unsecured claim based upon the Second Amended Partition Judgment, that forecloses the court in

11 applying the surcharge against Partition Sale Proceeds in dividing those proceeds between Debtor

12 and Petitioners.  The court disagrees.

13        Proof of Claim 12-1 states that the basis for the Claim is the Second Amended Petition

14 Judgment, which is attached to Proof of Claim 12-1; Exhibit B, to which the Tentative Statement

15 of Decision and the Statement of Decision, and their various attached exhibits, are attached as

16 Exhibits A and B, pp. 71-124.  Proof of Claim 12-1 is filed as Exhibit A by Debtor, Dckt. 79 in Adv.

17 Proc. No. 23-9006.  The Decisions provide a detailed review of the Partition Action, evidence

18 presented and factual determinations made (including credibility of testimony) and what the State

19 Court was addressing in determining that there are credits, surcharges, and attorney's fees and

20 expenses awarded.

21        When Proof of Claim 12-1 was filed on May 30, 2023, just as for the State Court Judge in

22 issuing the Second Amended Partition Judgment, the Residence Property had not been sold and the

23 Petitioners had no idea of what portion of the surcharge would be paid through the partition of the

24 Partition Sale Proceeds and what would remain as "just" a Judgment debt.  As of that time, the

25 Second Amended Partition Judgment had not been effectuated and the actual amount of the

26 unsecured claim, with respect to the surcharge portion, could not be finally computed.  In such a

27 situation, the creditor lists the full amount of the unsecured claim, as the State Court Judge did in

28 the Second Amended Judgment, and then amends the Proof of Claim once the partition of the

24

1  Partition Sale Proceeds occur and the surcharge amount is paid (whether in whole or part).

2        The Subchapter V Plan proposed in the Bankruptcy Case originally provided that the

3  Residence Property Partition Sale Proceeds were to be distributed by this Bankruptcy Court, with

4  the amounts to be distributed "in accordance with and pursuant to the specific terms of

5  Paragraph 1(a) on pages 2-3 'RESIDENCE PORTION OF THE REAL PROPERTY', and

6  Paragraphs 3(e)(vi), 3(e)(viii)(1)-(2) on page 5 of the [Second Amended Partition Judgment]. . . ."

7  Subchapter V Plan, ¶ 10.03; Dckt. 358 at 6. The proposed Subchapter V Plan then further provided

8  in ¶ 10.03 that in the event of a dispute between Debtor and Petitioners as to the distribution of the

9  Partition Sales Proceeds, then:

10      [t]he Bankruptcy Court shall retain jurisdiction to determine the distribution of the
    Residence sale proceeds and/or the credits to which the parties are entitled in

11      accordance with and pursuant to the specific terms of Paragraph 1(a) on pages 2-3
    "RESIDENCE PORTION OF THE REAL PROPERTY", and Paragraphs 3(e)(vi),

12      3(e)(viii)(1)-(2) on page 5 of the [Second Amended Partition Judgment].

13  The above cited provisions of the Second Amended Partition Judgment relate to the percentage

14  interests of Debtor and the Petitioners,¶ 1(a), and then a credit for their percentage interests, ¶ 3.

15  (vii)(e)(vi), and the credits awarded Debtor and the Petitioners, ¶ 3(e)(viii)(1) and (2).

16        However, Paragraph 10.03 of the Subchapter V Plan was deleted by the Debtor and

17  Petitioners as part of the confirmation, and the agreed language in the Order Confirming the

18  Subchapter V Plan, as amended (which was approved as to form by Counsel for the Debtor and

19  Counsel for Petitioners, among others), and the following is provided:

20

21      **IT IS FURTHER ORDERED THAT** section 10.03 of the 4th Amended
    Plan filed on October 11, 2024, is removed and replaced with the following:

22      The net proceeds from the sale of the Residence shall be held in the
    Subchapter V Trustee's trust account until further order of the

23      Bankruptcy Court.

24      The Bankruptcy Court shall retain jurisdiction to determine the
    respective parties' interests in the net proceeds and their disposition

25      as between Michael, Gary, and Sharon Hofmann.

26  Confirmation Order; Dckt. 470. The confirmed Subchapter V Plan, including the agreed to language

27  amending the Subchapter V Plan and deleting ¶ 10.03 of that Plan, does not impose any limits on

28  specific sections of the Second Amended Partition Judgment for determination of the Debtor's and

the Petitioners' partition interests in the Partition Sales Proceeds. This is also stated in the Civil Minutes from the final Confirmation hearing, which state:

> At the hearing, all parties supported confirmation of the Plan, as amended to state that the Bankruptcy Court will adjudicate the rights and interests of the parties in the proceeds from the sale of the residence property, without any limitation as to the provisions of the State Court Judgment and Orders, or other rights of the Parties. (Deleting the specific paragraph references in ¶ 10.03 of the Fourth Amended Plan).

Civ. Minutes; Dckt. 464 at 3.

Debtor's contention that the confirmation of the Subchapter V Plan locked the Petitioners into a determination of the distribution of the Partition Sale Proceeds based on Proof of Claim 12-1 and that the court could not consider the application of a surcharge in determining the partition of the Partition Sale Proceeds is without merit, such limitations having been expressly stricken from the Subchapter V Plan.

## COMPUTATION OF DEBTOR'S AND PETITIONERS'
## RESPECTIVE DISBURSEMENTS OF THE PARTITION SALE PROCEEDS

The court has constructed the following table to compute the distribution of the Partition Sale Proceeds between Debtor and Petitioners.

|  | Partition Sale Proceeds | $406,241.01 |  |
|---|---|---|---|
|  |  |  |  |
|  | **Computation of Credits and Surcharges** |  |  |
|  |  |  |  |
| **Credits For and Surcharges Against Debtor** |  |  |  |
| **Credits Awarded Debtor** | For Grain Tanks and Other Property Improvements | $142,122.00 |  |
| **Surcharges Imposed in Favor of Petitioners Against Debtor** | For Rent or Occupancy of Residence | ($84,300.00) |  |

| | | | |
|---|---|---|---|
| | Interest on Rent Surcharge to January 2022 Judgment | ($6,276.81) | |
| | Interest on Rent Surcharge at 10% Interest from February 2022 - August 2025 ($8,420) per year [3 years and 8 months] | ($30,873.33) ========= | |
| | Total Surcharge Awarded As Part of Judgment | ($121,450.14) | |
| | | | |
| | | **Net Credit Disbursed to Debtor** | **$20,671.86** |
| | | | |
| **Credits and Surcharges for Petitioners** | | | |
| | For Property Taxes paid through 2019 | $12,059.88 | |
| | For Property Taxes paid from 2019-2025 | $13,238.40 | |

| | | | |
|---|---|---|---|
| | For Necessary Property Improvements made by Gary Hofmann in Remediation of the Underground Storage Tank Issue | $11,145.96 | |
| | | | |
| | Application of Surcharge for Debtor's Occupancy of the Residence Property | $121,450.14 | |
| | | ========== | |
| | Total | $157,894.38 | |
| | | **Net Credit and Recoupment of Surcharge Disbursed to:** | |
| | | **Sharon Hofmann** | **$78,947.19** |
| | | **Gary Hofmann** | **$78,947.19** |

For the surcharge, the $121,450.14 is deducted from Debtor's side of the balance sheet and added to Petitioners'. The court awarded the surcharge to Petitioners in this manner because the State Court and California Appellate Court found:

> Finally, Michael contends he is owed a portion of the rent since he is an 8.33 percent owner of the Property; therefore, "[t]he trial court erred by not including his interest in the amount of rent awarded and makes any assessment of rent overly inflated." As Sharon and Gary point out, while Michael objected to aspects of the trial court's proposed statement of decision concerning the calculation of rent, he never objected on the grounds he raises for the first time on appeal. Since Michael failed to bring this omission to the trial court's attention, we will "infer the trial court made implied factual findings favorable to" Sharon and Gary on this issue and will review the implied factual findings under the substantial evidence standard. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 15U Ca1.App.4th 42, 59-60.) At trial, Smith testified his rental values were very conservative in nature. Based on this testimony, we infer the trial court assessed rental rates considering Michael's small, fractional ownership interest.

> In sum, Michael has not shown the trial court erred in surcharging him for the rental value of the Residence or in determining the amount of that surcharge.

28

Opinion, Exhibit 1 at 43, Dckt. 485. Therefore, the entire surcharge for rent and applicable interest is assessed against Debtor's credit and awarded in favor of Petitioners.

Therefore, credits and surcharges total $178,566.24, which is first distributed from Partition Sale Proceeds. That leaves $227,674.77 of the Partition Sale Proceeds for this court to partition between the Debtor and Petitioners.

| | | |
|---|---|---|
| **Net Partition Sale Proceeds After Disbursement of Credits and Application of Surcharges** | **$227,674.77** | |
| | | |
| | **Computation of Final Partition Disbursements to Debtor and Petitioners** | |
| **Computation of Debtor's Final Distribution of Partitioned Sale Proceeds** | | |
| Debtor's 8.3335% Interest in the Net Proceeds | $18,973.28 | |
| Debtor's Credits/Surcharge | $20,671.86 | |
| | **Total Disbursement to Debtor** | **$39,645.11** |
| | | |
| **Computation of Petitioners' Final Distribution of Partition Sale Proceeds** | | |
| Sharon Hofmann's 45.8333% Interest in the Net Proceeds | $104,350.86 | |
| Sharon Hofmann's Credits/Surcharge 50% | $78,947.19 | |
| | **Total Disbursement to Sharon Hofmann** | **$183,297.95** |
| | | |
| Gary Hofmann's 45.8333 Interest in the Net Proceeds | $104,350.86 | |
| Gary Hofmann's Credits/Surcharge 50% | $78,947.19 | |
| | **Total Disbursement to Gary Hofmann** | **$183,297.95** |
| | | ============ |

| | | **Partial Sale Proceeds Total Disbursement** | **$406,241.01** |
|---|---|---|---|

In addition to the above distribution, Walter Dahl, the Subchapter V Trustee shall distribute all interest that will have accrued on the $406,241.01 in Partition Sale Proceeds to Michael Hofmann, the Debtor. The Subchapter V Trustee stated at the hearing held on August 21, 2025 at 10:30 a.m. that this interest is being reported as income to Michael Hofmann to the taxing agencies. Counsel for Petitioners stated on the record that they have no opposition to the distribution of such accrued interest to the Debtor at the same hearing.

The court shall issue this Combined Memorandum Opinion and Decision for the Motion for Distribution of Proceeds filed by Petitioners in the Hofmann Bankruptcy Case, 23-09111, and for the Motion for Summary Judgment filed by Debtor in Adversary Proceeding 23-9006.

The court shall issue separate orders that grant the Motion for Order Distributing Funds from the Sale of Real Property, DCN: DB-2, in the Bankruptcy Case, and deny the Motion for Summary Judgment, DCN: BSH-1, filed in the Adversary Proceeding, consistent with this Decision, and order the Subchapter V Trustee to disburse the Partition Sale Proceeds to the Debtor and each Petitioner as set forth above.

As stated on the record, with the concurrence of the Parties, the court stays the effective date of the Orders for twenty-one (21) days from entry in light of this Bankruptcy Case and the Adversary Proceeding being transferred to the Hon. Christopher M. Klein at the end of August 2025.

**Dated:** August 29, 2025

**By the Court**

Ronald H. Sargis, Judge
United States Bankruptcy Court

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| Debtor(s) / Debtor(s) in Possession | Attorney(s) for the Debtor(s) / Debtor(s) in Possession (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| **Attorney(s) for the Trustee** (if any) | |